UNITED STATES DISTRICT COURT For Online Publication Only
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

GAC INTERNATIONAL, LLC,

                                    Plaintiff **MEMORANDUM & ORDER**

        -against- 15-CV-2375 (JMA)(AKT)

ROTH LICENSING LLC,

                                 Defendant.
------------------------------------------------------------------------ X

**APPEARANCES:**

    Richard M. Barnes, Linda S. Woolf, and Shevon D. Rockett
    Goodell, DeVries, Leech & Dann, LLP
    One South Street, 20th Floor
    Baltimore, Maryland 21202
        *Attorneys for Plaintiff*

    Richard Fama
    Cozen O'Connor
    45 Broadway, 16th Floor
    New York, NY 10006
        *Attorney for Plaintiff*

    Sean J. Kirby and Brian Daucher
    Sheppard Mullin Richter & Hampton LLP
    30 Rockefeller Plaza
    New York, NY 10112
        *Attorneys for Defendant*

                                                          **FILED**
                                                          **CLERK**
                                                6/1/2016 12:28 pm
                                        **U.S. DISTRICT COURT**
                        **EASTERN DISTRICT OF NEW YORK**
                                  **LONG ISLAND OFFICE**

**AZRACK, United States District Judge:**

        Plaintiff GAC International, LLC ("GAC") brings this action against defendant Roth Licensing, LLC ("Roth"), seeking a declaratory judgment of trademark non-infringement and no unjust enrichment. Pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., Roth moves to compel arbitration of these claims and stay the action pending arbitration or, alternatively, dismiss the case. For the following reasons, the Court hereby GRANTS the motion to compel arbitration and stays the proceedings pending arbitration.

1

# I. BACKGROUND

## A. Dr. Ronald Roth and His Legacy in Orthodontics

This dispute involves the intellectual property rights of the late Dr. Ronald Roth. Dr. Roth was a well-known practitioner and pioneer in the field of orthodontics. (Mem. in Supp. of Mot. to Compel Arbitration ("Def.'s Mem.") at 3, ECF No. 29-1.) An "orthodontic giant[]," Dr. Roth contributed to the advancement of clinical orthodontics by developing a bracket prescription for braces and teaching procedures used widely in the field today.[1] (Eugene L. Gottlieb, DDS, The Editor's Corner: A Farewell to Two Orthodontic Giants, 39 J. Clinical Orthodontics 277 (May 2005) ("Roth Tribute"); Mem. in Opp. to Mot. to Compel Arbitration ("Pl.'s Mem.") at 3–4, ECF No. 29-13.) In the 1970s, orthodontics began to shift from the manual adjustment of braces, which was both time-consuming and imprecise, to a pre-adjusted system. (Pl.'s Mem. at 2–3.)[2] Dr. Roth further developed the pre-adjusted system to create what is now known as the "Roth prescription," which efficiently provides a set of brackets that can be applied to most patients. (Pl.'s Mem. at 3–4.) Dr. Roth went on to teach and promote the "Roth Philosophy," a "goal-based system of diagnosis and treatment," which was adopted by practitioners and instructors of orthodontics. (Roth Tribute.)

As early as 1997, Dr. Roth's name has been used for advertising and selling orthodontic products. (Def.'s Mem. at 1.) When Dr. Roth passed away in 2005, his widow became his successor-in-interest. (Decl. of Brain M. Daucher ("Daucher Decl.") ¶ 5.) Today, Roth Licensing, LLC ("Roth") is Dr. Roth's successor-in-interest and owner of all intellectual property rights

---

[1] To correct misalignments between upper and lower teeth, orthodontists fit patients with braces, which exert forces that cause teeth to gradually move. (Pl.'s Mem at 2.) Braces are composed of "brackets," which attach to the teeth, and "arch wires." (Id.)

[2] GAC cites to numerous scholarly articles in its discussion of Dr. Roth and orthodontics. The Court does not repeat them herein, but they are attached as exhibits to the Declaration of Richard Fama, ECF No. 29-14.

pertaining to Dr. Roth. (Def.'s Mem. at 1.) Dr. Roth left behind three daughters, who, as members of Roth, seek to defend their father's legacy and intellectual property rights. (Id.; see License Agreement, Ex. 2 to Daucher Decl., ECF No. 29-4.)

**B. The Relationship Between Roth and GAC**

This action is not the parties' first dispute over Dr. Roth's name and legacy. In 2003, GAC, a distributor of orthodontic products and services, received a license from Dr. Roth himself to use his name, trademark, and other intellectual property rights. (Compl. ¶¶ 1, 8; Daucher Decl. ¶ 3.) When Dr. Roth passed away in 2005, the licensing agreement automatically terminated, but GAC continued to use the Roth Rights without compensating Dr. Roth's successors. (Daucher Decl. ¶ 5.) In 2007, the parties negotiated a settlement, under which GAC would pay for its prior, unauthorized use and receive a continuing license for five years. (Id. ¶ 6.) Upon expiration of that license's term, the parties again became embroiled in a dispute over GAC's continued use of Dr. Roth's name, image, and endorsement. (Id. ¶ 7.) In 2012, under the terms of the parties' license agreement, Roth filed an arbitration demand against GAC for trademark infringement under the Lanham Act, common law infringement of the right of publicity, and violation of California Civil Code § 3344.1. (Id. ¶ 8.) That arbitration led to the license agreement at issue here. (Id. ¶¶ 8–9.)

**C. The 2012 License Agreement and Its Terms**

To settle Roth's claims against GAC, the parties entered into a three-year license agreement in March 2013, effective retroactively from January 1, 2012 (the "Agreement"). (Daucher Decl. ¶ 9.) As under the previous license agreements, Roth required that GAC pay a fixed fee of $200,000 per year. (Id.; Agreement ¶ 1.2.)

The Agreement defines the "Roth Rights" as those "pertaining to Dr. Roth including, but not limited to, the right to use the name, image, endorsement, right of publicity, and related

3

copyright, trademark, and trade name rights of Dr. Roth" and the "Roth Marks" as the "common law and registered trademarks incorporating the trademark ROTH as set forth in Schedule A hereto." (Agreement at 1.) The Agreement granted GAC, as "Licensee," the "non-exclusive right to use the Roth Rights and the Roth Marks on a worldwide basis for marketing, advertising, and promoting Licensee's orthodontic products and services during the term of this Agreement" and the exclusive right to use a number of composite Roth Marks. (Agreement ¶ 1.1.) The Agreement also provides:

> <u>Reservation of Rights</u>. This Agreement does not govern, prohibit, or otherwise limit, Licensee's right and ability to use any trademark that does <u>not</u> incorporate the Roth name during or following its term, including the use of any of the non-ROTH portions of the marks listed in Schedule A and the non-ROTH portions of any New Mark. (<u>Id.</u> ¶ 1.6)
>
> ****
>
> <u>No Contest</u>. Licensee shall not contest the Roth Rights or the Roth Marks, including Licensor's ownership thereof, either during or after the term of the License. (<u>Id.</u> ¶ 2.3)
>
> ****
>
> <u>Licensee's Obligations Upon Termination.</u> Within 90 days of termination of this Agreement, Licensee shall cease any and all use of the Roth Rights, including marks that include the word ROTH, and deliver to Licensor or destroy any and all marketing, advertising or promotional materials bearing the Roth Marks or otherwise incorporating the Roth Rights. (<u>Id.</u> ¶ 3.4)

Finally, the Agreement's arbitration clause provides: "<u>Any claim or controversy arising out of or relating to</u> this License Agreement shall be settled by arbitration through ADR Services, Inc. ("ADR Services") in San Francisco, California." (Agreement ¶ 4.5 (emphasis added).)

## D. The Instant Dispute

After the Agreement expired in December 2014, GAC had ninety days to cease use of the Roth Marks and Roth Rights. (<u>See</u> Agreement ¶ 3.4; Daucher Decl. ¶ 10.) Beginning in 2015, GAC began using the notations "RT" and "RT Rx" to identify its products' compatibility with the

4

Roth prescription. (Compl. ¶ 13.) GAC also included the disclaimer: "Our RT Rx has values that are equivalent to the Roth® prescription values. No endorsement is implied. Roth® is a registered trademark of Roth Licensing LLC." (Compl. ¶ 13.)

On April 15, 2015, Roth sent GAC a cease and desist letter. (Daucher Decl. ¶ 10; Letter from Brian Daucher to Dane Baumgardner, Apr. 15, 2015 ("Cease & Desist Letter"), Ex. 5 to Daucher Decl., ECF No 29-7.) In the letter, Roth objected to the notations "RT" and "RT Rx" as a clear association with Roth and warned GAC that its conduct constituted bad faith and on-going use of the Roth Rights, in breach of the Agreement. (Compl. ¶ 14; Cease & Desist Letter.) GAC responded to Roth with a letter, denying all of the allegations. (Letter from Dane Baumgardner to Brian Daucher, Apr. 22, 2015, Ex. 6 to Daucher Decl., ECF No. 29-8.)

Soon after, on April 27, 2015, GAC filed this lawsuit, seeking a declaratory judgment of trademark non-infringement and no unjust enrichment.[3] The complaint indicates that because patients and orthodontists choose brackets based on compatibility with prescriptions, including Dr. Roth's prescription, manufacturers commonly identify a prescription in the product's marketing and labeling. (Compl. ¶ 7.) The complaint also refers to the parties' licensing arrangements, first granted to GAC by Dr. Roth, which provided GAC with ability to use the Roth Rights and Roth Marks. (Id. ¶ 9.) The complaint alleges that the Agreement governed use of the Roth Rights and Marks for marketing, advertising, and promoting but "not the generic use to describe compatibility with the Roth prescription." (Id.) Furthermore, GAC alleges that even during the Agreement's term, other unlicensed third parties used the Roth Marks and Roth Rights. (Id. ¶ 11.) Therefore, because of their widespread use—unmitigated by Roth—such marks have, according to GAC, "eroded and become genericized." (Id.) Moreover, the complaint asserts that GAC has complied

---

[3] Roth allegedly filed a demand for arbitration against GAC less than a week later. (Daucher Decl. ¶ 11.)

5

with its obligations under the Agreement and "is under a real and reasonable apprehension of being sued . . . in view of [Roth's] cease and desist letter . . . ."  (Id. ¶¶ 12, 14.)

In support of its request for a declaration of trademark non-infringement, GAC argues that it uses the unregistered marks "RT" and "RT Rx" with a disclaimer to communicate generic product compatibility with the Roth prescription values; thus, there is no likelihood of consumer confusion.  (Id. ¶¶ 18–19.)  GAC also claims it has not been unjustly enriched because Roth has permitted public use of the Roth Rights and Roth Marks without requiring others to obtain a license or compensate Roth. (Id. ¶ 25.)  Roth has moved to compel arbitration of these claims.

## II. DISCUSSION

### A. Legal Principles Under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that a written agreement to arbitrate disputes arising out of a contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Congress enacted the FAA to promote the enforcement of agreements to arbitrate and to support a "strong federal policy favoring arbitration as an alternative means of dispute resolution."  Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co., 189 F.3d 289, 294 (2d Cir. 1999) (quoting Oldroyd v. Elmira Sav. Bank, FSB, 134 F.3d 72, 76 (2d Cir. 1998), abrogated on other grounds by Katz v. Cellco, 794 F.3d 341 (2d Cir. 2015)); see also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 54 (1995).  Reversing past "judicial hostility" toward arbitration agreements, the FAA helps parties use arbitration to avoid the costs and delays associated with litigation.  Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (1987) (quoting Scherk v. Alberto–Culver Co., 417 U.S. 506, 510 (1974)).  "Now, it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy [courts] have often and emphatically applied."  Arciniaga v. Gen.

Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006) (quoting Leadertex, Inc. v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 25 (2d Cir. 1995)) (internal quotation marks omitted). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Chelsea Square Textiles, 189 F.3d at 294 (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983)). However, the FAA does not requires parties to arbitrate if they did not agree to do so. Collins & Aikman Products Co. v. Bldg. Sys., Inc., 58 F.3d 16, 19 (2d Cir. 1995).

To determine whether a particular dispute is arbitrable, the court asks whether the parties agreed to arbitrate, and if so, whether the claim at issue falls within the scope of the agreement to arbitrate. Bank Julius Baer & Co. v. Waxfield Ltd., 424 F.3d 278, 281–82 (2d Cir. 2005), abrogated on other grounds by Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287 (2010). The court answers the second question using the following set of inquiries:

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001) (internal citations and quotation marks omitted). An arbitration clause may be classified as broad if "the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause . . . ."

7

Id. at 225.  On the other hand, a narrow clause is one in which "arbitration was designed to play a more limited role in any future dispute."  Id.

When assessing whether a claim falls within the scope of an arbitration agreement, the court looks beyond the parties' labels to focus on "the factual allegations in the complaint rather than the legal causes of action asserted."  Genesco, 815 F.2d at 846.  "If the allegations underlying the claims 'touch matters' covered by the parties' [agreement], then those claims must be arbitrated . . . ."  Id. (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 624 n.13 (1985)).  Given these underlying principles, "arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  McMahan Sec. Co. L.P. v. Forum Capital Mkts. L.P., 35 F.3d 82, 88 (2d Cir. 1994) (quoting S.A. Mineracao Da Trindade–Samitri v. Utah Int'l, Inc., 745 F.2d 190, 194–95 (2d Cir. 1984)).

**B. Application**

At issue here is whether GAC's claims for declaratory judgment of trademark non-infringement and no unjust enrichment fall within the scope of the parties' arbitration agreement.

**1. The Arbitration Clause is Broad**

First, the Court classifies the parties' arbitration clause as a broad clause.  The arbitration provision provides that "[a]ny claim or controversy <u>arising out of or relating to</u> this License Agreement shall be settled by arbitration . . . ."  (Agreement ¶ 4.5 (emphasis added).)  This language is a "prototypical broad arbitration provision."  Oldroyd, 134 F.3d at 76 (finding clause which stated that "[a]ny dispute, controversy or claim arising under or in connection with this Agreement shall be settled exclusively by arbitration" was a broad arbitration clause); see also Collins & Aikman, 58 F.3d at 20 (finding a clause that mandated arbitration of "'[a]ny claim or

8

controversy arising out of or relating to th[e] agreement,' [to be] the paradigm of a broad clause" (alterations in original)). Therefore, the presumption of arbitrability arises. GAC's claims must be arbitrated if they are within the Agreement on their face or if they at least implicate the contract's construction or the parties' contractual rights and obligations. See Louis Dreyfus Negoce, 252 F.3d at 224.

**2. GAC's Claims Fall Within the Scope of the Arbitration Clause**

In its opposition to Roth's motion to compel arbitration, GAC proposes three reasons why its claims fall outside the arbitration clause's scope. First, GAC argues that its claims arise out of or relate to statutory and common law trademark principles, rather than its rights and obligations under the Agreement. Second, GAC contends that "RT" and "RT Rx" are descriptive means to identify product compatibility and are thus outside the scope of the Agreement, which governed use for marketing, advertising, and promoting. Finally, GAC asserts that its claims are temporally outside the scope of the Agreement and its arbitration clause. Each argument fails.

While GAC's claims indeed involve and implicate statutory and common law trademark principles, this does not compel the conclusion that the claims are outside of the Agreement. GAC proposes that, on their face, the claims are not governed by the Agreement and do not raise any questions implicating rights and obligations under the Agreement. GAC points to the language: "This Agreement does not govern, prohibit, or otherwise limit, Licensee's right and ability to use any trademark that does not incorporate the Roth name during or following its term . . . ." (Agreement ¶ 1.6.) However, the declaratory relief sought here still implicates the parties' rights and obligations under the Agreement as well as construction of the Agreement.

The Court looks beyond the claims' legal labels to the factual allegations, which clearly indicate that the Agreement with Roth is a critical piece of this dispute. Notably, GAC filed this

9

suit after Roth sent a cease and desist letter, objecting that GAC's use of "RT" and "RT Rx" violated the terms of their Agreement.  Also, GAC alleges it is entitled to a declaration of trademark non-infringement and no unjust enrichment, because the Roth Marks and Roth Rights have become genericized, even though Roth had promised GAC the exclusive right to use certain marks during the Agreement's term.  However, GAC agreed not to contest the Roth Rights or Roth Marks "during <u>or after the term of the License</u>." [4]  (Agreement ¶ 2.3 (emphasis added).)  GAC also agreed to "cease any and all use of the Roth Rights" within ninety days of the Agreement's end.  (Agreement ¶ 3.4.)  Moreover, contrary to GAC's assertion that the Agreement is immaterial to the claims here, GAC's status as a former licensee is relevant in a dispute over infringement of intellectual property rights and unjust enrichment.  <u>See</u> <u>Sunward Elecs., Inc. v. McDonald</u>, 362 F.3d 17, 25 (2d Cir. 2004) (noting that there is an increased danger of consumer confusion when alleged trademark infringement involves former licensee); <u>see also</u> <u>Church of Scientology Int'l v. Elmira Mission of the Church of Scientology</u>, 794 F.2d 38, 41–42 (2d Cir. 1986).  Thus, regardless of how GAC has labeled its claims, the factual allegations here "touch matters" covered by the parties' Agreement.  <u>See</u> <u>Genesco</u>, 815 F.2d at 847 (quoting <u>Mitsubishi Motors Corp.</u>, 473 U.S. at 624 n.13)).

GAC also attempts to avoid arbitration by asking the Court to determine that GAC's use of "RT" and "RT Rx" does not infringe upon the Roth Rights or Roth Marks.  However, this merits determination is one left to the arbitrator.  <u>See, e.g.</u>, <u>Norcom Elecs. Corp. v. CIM USA Inc.</u>, 104 F. Supp. 2d 198, 205–06 (S.D.N.Y. 2000) (finding that Lanham Act claims were encompassed by

---

[4]  Arguably, there is tension between ¶ 1.6, which excludes from the Agreement "marks that do <u>not</u> include the Roth name," and ¶ 2.3, which precludes GAC from contesting the Roth Rights or Roth Marks.  However, questions about the interpretation of these provisions weigh in favor of arbitration.  <u>See</u> <u>Louis Dreyfus Negoce</u>, 252 F.3d at 224 (finding that when the clause is broad, arbitration should be compelled for matters that at least "implicate[] issues of contract construction or the parties' rights and obligations under [the contract]").

10

the broad arbitration clause in a distributor agreement because the claims involved interpretation of the agreement's provision governing trademarks); Polymer Tech. Sys., Inc. v. Roche Diagnostics Corp., No. 10-CV-0061, 2010 WL 3782173, at *1 (S.D. Ind. Sept. 20, 2010) (finding that a former licensee's claim for declaratory judgment of non-infringement fell within the scope of the parties' arbitration agreement, even though licensee insisted it had substantially changed the product in question). "RT" and "RT Rx" are not registered trademarks, but, by the Agreement's terms, GAC promised to cease use of the Roth Rights and Marks and avoid contesting Roth's intellectual property ownership.[5] In support of its argument that the claims are not related to the Agreement, GAC cites three cases. The Court agrees with Roth that they are all easily distinguishable.

First, Collins & Aikman, involved two separate agreements, a 1977 sales representative arrangement and an unrelated 1988 confidentiality agreement. 58 F.3d at 18. The 1988 contract involved negotiations for defendant to acquire plaintiff's business and—unlike the 1977 contract—contained no arbitration clause. Id. at 18–19. The court found that a tortious interference claim was not arbitrable because it did not at all involve the 1977 agreement, but instead concerned the 1988 agreement's confidential information and third party business relationships. Id. at 22. Here there is only one contract involved, and it contains an arbitration clause.

In NASDAQ OMX Group, Inc. v. UBS Securities, LLC, the arbitration clause itself contained an exclusion: "Except as may be provided in the NASDAQ OMX Requirements, all claims . . . arising out of, or relating to this Agreement . . . shall be settled by final binding arbitration . . . ." 770 F.3d 1010, 1016 (2d Cir. 2014) (emphasis added). The relevant NASDAQ

---

[5] Of course, Roth contends that GAC's notations constitute "clear reference to Roth." (Def.'s Mem. at 2.) Roth also cites to a number of cases demonstrating that the abbreviated use of a trademark can still be considered trademark infringement. (See id. at 11–12.)

11

rule precluded members from seeking compensation for losses attributable to the exchange's handling of securities transactions. Id. at 1034. The court found a clear intent to exclude the relevant claim from arbitration "[b]ecause the parties subjected their otherwise broad arbitration agreement to the limitations imposed by NASDAQ rules . . . ." Id. at 1034. However, the Agreement here does not contain any provision that precludes liability for specific claims, and the arbitration clause does not contain any exclusions from its scope.

Finally, in Kuklachev v. Gelfman, the court found a trademark infringement claim was not arbitrable because although the performance agreement contained an arbitration clause, the agreement was between a promoter and artist and did not involve intellectual property at all. 600 F. Supp. 2d 437, 452 (E.D.N.Y. 2009). After the promoter began copying the artist's performances, the artist sued for, inter alia, trademark infringement. Id. at 453. That claim was not arbitrable under the agreement because nothing in the performance contract indicated that the contract concerned intellectual property rights. Id. 461–62. By contrast, the Agreement between GAC and Roth squarely pertains to intellectual property rights. Therefore, the Court rejects GAC's argument that its claims arise out of or relate to only trademark principles and not the Agreement.

GAC's second argument, which asserts that arbitration should not be compelled because GAC uses "RT" and "RT Rx" for descriptive purposes only, again asks the Court to make a determination that should be left to the arbitrator. GAC accurately states that the Agreement governs the use of the Roth Rights and Roth Marks for purposes of "marketing, advertising, and promoting." (Agreement ¶ 1.1.) But whether GAC's use of "RT" and "RT Rx" constitutes permissible use is a merits determination that also requires construction of the parties' Agreement, including the meaning of "marketing, advertising, and promoting." (Id.) Therefore, GAC's claims involves interpretation of the parties' Agreement, and arbitration is presumptively appropriate.

See Louis Dreyfus Negoce, 252 F.3d at 224. Additionally, to the extent there are "any doubts" as to arbitrability, they "should be resolved in favor of arbitration . . . ." Chelsea Square Textiles, 189 F.3d at 294 (quoting Moses H. Cone, 460 U.S. at 24–25).

In its final argument, GAC asserts that the dispute is outside the scope of the Agreement and the arbitration clause because it concerns conduct that occurred after the Agreement expired. GAC, however, acknowledges that arbitration provisions can apply to disputes arising after an agreement's expiration. See Nolde Bros. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 249 (1977); Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B., 501 U.S. 190, 205–06 (1991).

There are three circumstances in which a post-expiration grievance can be said to arise under a contract and, therefore, remain subject to a contract's arbitration provisions: "[(1) where] it involves facts and occurrences that arose before expiration, [(2)] where an action taken after expiration infringes a right that accrued or vested under the agreement, or [(3)] where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement." Litton, 501 U.S. at 206. The Court agrees with Roth that, under Litton, the dispute arises under the parties' Agreement.

Here, the Agreement contains rights and obligations that explicitly continue after the expiration of its term. (See Agreement ¶ 2.3 (dictating that GAC will not contest the Roth Rights or Roth Marks "either during or after the term of the License" (emphasis added); Agreement ¶ 2.2 (requiring further cooperation to protect Roth's ownership of intellectual property "whether during the term of this License, or thereafter" (emphasis added).) These provisions make clear that certain terms continued even after the Agreement expired. Furthermore, the Agreement provided Roth the contractual right—and imposed on GAC the obligation—that GAC would cease any use of the

13

Roth Rights and Roth Marks after the Agreement expired.  The facts alleged in the complaint and the Agreement itself demonstrate that the arbitration clause governs this post-expiration dispute.

The Court finds GAC's remaining arguments are without merit.  For the reasons stated above, GAC's claims for declaratory relief are subject to arbitration.

### C. The Action is Stayed

The FAA provides that if the court is "satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, [the court] shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ."  9 U.S.C.A § 3.  Roth has requested that the case be stayed or dismissed in favor of arbitration.  Because the Court finds arbitration should be compelled for all of GAC's claims, the case will be stayed pending the outcome of arbitration.  See Katz v. Cellco P'ship, 794 F.3d 341, 343 (2d Cir. 2015) (finding that the FAA requires a stay of proceedings "when all claims are referred to arbitration and a stay [is] requested" by at least one of the parties).

### III. CONCLUSION

For the foregoing reasons, Roth's motion to compel arbitration is GRANTED.  The proceedings are stayed pending arbitration of GAC's claims.  The parties are directed to inform the Court of any resolution of the arbitration proceedings or any other event that would affect the stay of this matter.

**SO ORDERED.**

Dated:  June 1, 2016
Central Islip, New York

                                            _____/s/ (JMA)_____
                                            JOAN M. AZRACK
                                            UNITED STATES DISTRICT JUDGE